**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 15 CR 526 |
| v. | ) |
| | ) Judge LEINENWEBER |
| THADDEUS JIMENEZ, ET AL. | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT THADDEUS JIMENEZ'S POSITION PAPER ON SENTENCING
AND GUIDELINE COMMENTS[1]**

Defendant, THADDEUS JIMENEZ, by his attorney, STEVEN A. GREENBERG, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. §3553(a), as well as the Sixth Amendment of the Constitution of the United States, and the Supreme Court's opinion in *United States v. Booker,* 543 U.S. 220 (2005), hereby submits the following Position Paper on Sentencing. Defendant respectfully requests the minimum sentence available, having already spent more than a decade in prison for a crime he did not commit. That would be consistent with 18 U.S.C. §3553(a)(2). Such a sentence would be sufficient but not greater than necessary to achieve the sentencing goals in 18 U.S.C. §3553(a)(2).

A lengthy penitentiary sentence would be inconsistent with the limitations of 18 U.S.C. §3582:

(a)  Factors To Be Considered in Imposing a Term of Imprisonment.

---

[1] Counsel apologizes for filing this Position Paper one day late, but he was on trial in a child pornography case in Will County (*People v. Conrad*, 12 CF 1197) that has taken longer than anticipated.

> The court, in determining whether to impose a term of imprisonment, and, if a term of Imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

As the Supreme Court has emphasized, punishment, "fit[s] the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011).

I.     **The 18 (U.S.C. §3553(a) Factors**

The Court is no doubt familiar with the wide sentencing discretion provided under 18 U.S.C. §3553(a) in the years since the Supreme Court decided *United States v. Booker,* 543 U.S. 220 (2005), and as was reiterated in such cases as *United States v. Rita*, 553, U.S. 338 (2007), and *Gall v. United States*, 552 U.S. 38 (2007).[2]

Section 3553(a) obligates this Court to impose a sentence that is "sufficient, but not greater than necessary to comply with" the purposes of sentencing set forth by Congress. See 18 U.S.C. §3553(a). Those include:

- To provide just punishment;

- To create adequate deterrence;

---

[2] The *Gall* court explained the post-Booker sentencing procedures as follows:
   [A] District court should begin al sentencing proceedings by correctly calculating the applicable Guidelines. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the . §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume the that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. *Gall,* 522 U.S. at 49-50 (internal citations omitted)

- To protect the public; and,

- To provide the defendant with necessary treatment and training.

18 U.S.C. §3553(a)(2).

Amongst the sentencing factors the court is to consider under 18. U.S.C. **§**3553(a) are:

- The nature and circumstances of the offence;

- The history of the Defendant;

- The characteristics of the defendant

- The kind of sentences available

- The sentencing guideline range

- Relevant policy statements by the Sentencing Commission

- The need to avoid unwarranted sentencing disparities among defendants with similar records that engaged in similar conduct.

Importantly, the Guidelines are now reduced to only one of numerous factors the court must consider when imposing a sentence. See *United States v. Booker,* 543 U.S. 220 (2005), 125 S.Ct. 738, at 764 (citing §3553(a) for the proposition that the Sentencing Reform Act "requires judges to take account of the Guidelines together with other sentencing goals."

Since under the Sentencing Reform Act, "n[o] limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," (*Booker,* 543 U.S. at 251, quoting 18 US.C. §3661), this Court is obligated to consider factors that the Guidelines previously precluded. Sentencing is no longer formulistic; it is individualized.

Notably, and importantly in this case, the Seventh Circuit has recognized that the sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing

3

range as reasonable per-se." *United States v. Cunningham*, 429 F.3rd 673, 676 (7th Cir. 2005). This Court should impose a sentence below the advisory guideline range when that sentence conforms to the §3553 factors. While the guidelines remain a factor in the post-Booker world, this Court should not presume that they will produce the "correct" sentence. *United States v. Demaree,* 459 F.3d 791, 794-795 (7th Cir. 2006).

As a result of *Booker* and decisions that have followed, the only limitation upon this Court is that the sentence not be "unreasonable," §3553(a); *Booker* at 765-66; *Kimbrough v. United States,* 128 S.Ct. 558, 575 (2007); and *Gall v. United States*, 128 S.Ct. 586, 594 n.2 (2007).

### A.  3553(A)(L): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Section 3553(a) appropriately counsels that the offending conduct be considered in conjunction with the history and characteristics of the defendant. 18 U.S.C. §3553(a)(l). This is because Congress has recognized that good people who make bad decisions are still good people. And sometimes bad things happen to people that are not their fault, but shape their lives. Moreover, Congress has recognized that the conduct cannot be looked at in isolation just as the person cannot be looked at in isolation. One must look at what they did wrong and try to understand them as a person, evaluating the conduct vis-à-vis how they have lived their life otherwise.

The offense here is indeed grave, but it must be balanced against the truly unique and tragic history and characteristics of this Defendant.

It is no exaggeration to say that Thaddeus is a survivor of 16 years of physical deprivation, assault and psychological torture. Thaddeus was arrested, tried and imprisoned – spending years in the "hole" or segregation -- for a crime he did not commit. His disturbing

4

story began when he was only 11 years old, and by age 13 he was framed for the murder he did not commit.

Thaddeus was born in Chicago to a Polish mother and an absentee Hispanic father. Their combative, on-again / off again relationship, fueled by alcohol and abuse, was the slippery slope on which he struggled to find his footing. Bounced back and forth between California and Chicago, by the time he turned 11, Thaddeus had been in eight different schools.

With his father out of the picture and his mother fighting her own substance abuse problems, he was close to his older sister and especially dear to his grandmother, the family matriarch whom he called "the backbone" of the family.[3] She provided him with the only stability he ever knew. Looking to his uncles as father figures, he was thrilled when they made time for him, taking him fishing or to a softball game. But these uncles he admired were part of the Simon City Royals street gang, and Thaddeus was drawn to that world as well.

At age 10, he began skipping school, dabbling in drugs and generating a juvenile record of relatively minor infractions. It was enough to bring him into the juvenile court system. While there, he benefited with structured contact with a counselor and his Unified Delinquency Intervention Services (UDIS) case worker. He made progress, and was set for probation.[4]

Then, at age 13, the bottom fell out for Thaddeus. For reasons that remain vague, he was arrested and charged with a gang-related murder.[5] Against the recommendation of the forensic clinical psychiatrist appointed by the court, he was tried as an adult. After being found guilty, Thaddeus was sentenced to 50 years in prison.

---

[3] For a detailed summary of Thaddeus' childhood, See Exhibit A, *Forensic Clinical Psychologist Report*, pp. 5-7 and the PSI ¶¶ 74-76. Defendant is requesting that the original of Exhibit A be filed under seal. A copy is being provided with the courtesy copy of this report.
[4] See Exhibit A, pp. 2,7 and PSI ¶49
[5] PSI ¶64

5

At age 15, Thaddeus was transferred into the IDOC youth division, where he was placed in isolation simply because of the seriousness of his crime. During this time, he went through puberty with little understanding of what was happening. He was repeatedly "jumped" and victimized due to his small size (at the time, he was just over 5 feet tall and 100 pounds).[6] He began suffering from the depression which would haunt him throughout the 16 years of his incarceration and continues to persist, even after his release.[7]

At age 17, dumped into adult prison, the teenager remained a target. He was terrorized on a daily basis, at times assaulted by both prisoners and guards. His response when confronted was that of a cornered animal – he fought back and was often sentenced to segregation.[8] As a survival tactic, he associated with gangs in an effort to protect himself, and there he found the only sense of belonging he could under these conditions. But that association only led to more infractions.

For the next decade, each transfer to a new facility brought with it new terrors -- repeated strip searches, then cavity searches, invasive medical procedures,[9] a loss of contact visits, and long stretches of isolation. With each move, the letters and visits from his family declined. His grandmother stayed in contact, but as she aged, she could no longer make the drive to see him.

The legal system provided its own roller coaster of hope and despair.[10] Thaddeus was granted a second trial – only to be convicted again. An appeal was filed and lost. He would write frantic letters to lawyers, the ACLU and other advocacy groups begging for help, his spirits rising and falling with each mail call. Over time, he began alternating between two ways of coping with the constant fury, depression and despair he experienced. He was by turns combative

---

[6] See Exhibit A, pp. 10-11.
[7] See PSI, ¶87 and Exhibit A pp. 16, 20, 23.
[8] See Exhibit A, pp. 12-13
[9] See Exhibit A, pp. 14-15
[10] See Exhibit A, p. 27

6

and intractable, then withdrawn to an almost catatonic state. By 2002, due to various disciplinary infractions, incredibly, he spent four (4) consecutive years in segregation, with no access to the telephone and little human contact. Imagine the psychological scarring from this excessive isolation. It was during this time that many of his family members died, including his beloved grandmother. This only intensified his feelings of helplessness.[11]

When Thaddeus finally caught the attention of the Northwestern University Innocence Project, it took another three agonizing years to free him. The 32-year-old man who emerged from the prison system in 2009 had survived, but he was broken. Understandably diagnosed with PTSD,[12] he was unable to cope with crowds; experienced flashbacks, sleep disorders, and paralyzing anxiety and depression.

Though he had the support of his sister, he remained estranged from the majority of his surviving family,[13] and was at a loss when it came to building normal life. Having entered the prison system as a child, he had been robbed of all the normal emotional and cognitive milestones and the family support that normally guides children through them. He emerged both developmentally and educationally stunted.[14]

His sole focus for so long had been to gnaw at the untenable trap in which he found himself, he had made no plans for what might come after. Because he feared he had no future outside of prison, he had never made plans for life outside. He had never imagined himself living a normal life. To do so would just provide his tormentors with something else to take away.

---

[11] See Exhibit A, p. 15.
[12] See Exhibit A, pp. 5, 23,28, diagnosed by Peggy Hough, MA, LCPC, CDAC and confirmed by the Forensic Clinical Psychiatrist's report, and PSI ¶88.
[13] PSI ¶78.
[14] See Exhibit A, pp. 25-26.

At first, Thaddeus was able to keep busy with his legal team, who filed a lawsuit on his behalf. He found a girlfriend and tried to build his first romantic relationship, fathering two children with her: Solomon in 2010 and Jackie in 2013. But he struggled, and had difficulty expressing his emotions and his affection. Having never had a good father, his efforts to be one caused him further anxiety and rekindled old demons.[15] He wanted to find some kind of job, but his education was limited and due to his behavior issues, he had not qualified for many educational or skill enrichment programs while in prison.

His incarceration left him with understandable trust issues that interfered with this ability to seek help or counseling, though he did attend counseling sessions with therapist Dr. Peggy Hough[16] after his release, who identified his PTSD. He began self-medicating, abusing illegal drugs to combat his anxiety, hypervigilance and other PTSD symptoms, using marijuana and cocaine daily to adjust his moods and wakefulness.[17]

Thaddeus' lawsuit was ultimately successful in 2012. The court awarded him $25,000,000.00 – but the lawyers took nearly half, and the streets would take the rest. Isolated, with few adult skills and no financial advice, he ran though the money quickly. He bought fancy cars, lavished money on others, paid bonds and for lawyers, bought drugs, threw parties, had a posse, and funded a gang. The one purchase that made sense was a house in Niles for the mother of his two children, a gift to them.[18]

Unfortunately, while he had money, he had no guidance. No one suggested he seek financial planning, remain in counseling, or that he leave town and make a new start. He was

---

[15] Exhibit A, p. 20 and PSI ¶79.
[16] Dr. Hough, (not Hughes, as identified in PSI¶88) is still practicing in Evanston.
[17] PSI ¶¶92-93.
[18] PSI ¶79

back on the streets of his childhood, but this time virtually alone, having lost so many family members while in prison. His new family became the gang, reconstructed from his childhood memory of his uncles, the kids he had run with before his first arrest, and the few people who had stood up for him in prison.

On the street, the newspaper headlines and talk of a cash settlement brought the wrong elements to him. The boy whose confidence, security and self-esteem had been suddenly and irreparably shattered had for decades he had survived always on the bottom of the totem pole in prison. But now, he was abruptly the center of a new kind of attention. He was flattered, encouraged and exploited by hangers-on, eager to take advantage of his largess. They became his crew – for a price – and gave him the self-esteem he had always craved and had never had. He was suddenly someone who mattered.

With their encouragement, his settlement was squandered on status-enhancing material goods[19] and on reviving the Simon City Royals, the all-but-defunct gang of his childhood, where Thaddeus would literally pay others on the street to join and play his game.[20] He reimagined it on a clinically grandiose scale – a kind of Camelot of loyal comrades-in arms – with himself as its head – not a broken, shaken man unable to function in the real world – but in this more familiar realm, a leader, a king – in control, powerful, invulnerable.

Once again, Thaddeus was on a slippery slope, no longer a child, but with no real world adult experiences or coping skills to aid him. His judgement clouded by substance abuse, he fell back on the only two methods of coping he had ever learned: withdrawing into himself or giving way to his pent-up anger with aggression. Family members confirmed he was subject to

---

[19] PSI ¶¶8,15,21
[20] PSI ¶43

9

paranoia, depressive isolation and panic attacks;[21] he acquired firearms for protection and possessed them even after his FOID card was revoked. He began once again to have run-ins with the law, the majority of them drug-related.[22]

Then, on August 17, 2015, Thaddeus was filmed as he and Jose Ramon, another member of the reconstituted Royals, drove around a Chicago neighborhood in broad daylight, in an open convertible, acting the role of kingpin gangsters for the camera. They showed off their guns, their fancy car, and shouted allegiance to their gang to an audience of largely mystified passersby. No real gang members, no one in their right mind, acts this way. As the camera rolls, the posturing escalates, growing more and more frenzied, until it abruptly ends in tragedy – a friend approaches the car only to find himself cast in the role of a rival gang-banger. To his palpable shock, and for no reason rooted in reality, the trigger is pulled. [23]

Terrible as the consequences were, they were the result of a drug-fueled illusion, one that took hold in a man desperately trying to control a world that had victimized him and broken him. Ironically, the restitution he received for his terrible injuries did not bring healing; it just drew other vultures to pick at his wounds.

After his arrest, Thaddeus was once again subjected to constant violence. Given his notoriety, there was a bounty on his head from other rival gangs. Authorities in Cook County moved him to Platte County Jail, but he was still in danger. There, he received a severe beating, while the guards stood idly by, that required eight staples to close the gash in his head.

To look at the man the camera saw the day of the crime might make locking him up and leaving him to fend for himself seem like an easy, even popular decision. But the camera sees

---

[21] See Exhibit A, p.24
[22] PSI ¶¶40-41,44
[23] PSI ¶¶ 10-12

10

only what was on the surface in one fleeting, delusional moment. It does not show what is inside Thaddeus: the things that were taken from him, the people he lost, the inequities that tore him apart. It does not see the better person, the good father, the loving brother and son that Thaddeus, with the help that never came, could still be.

### B. THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT OF THE LAW, TO PROVIDE JUST PUNISHMENT AND ADEQUATE DETERRENCE, AND TO PROVIDE THE DEFENDANT WITH NEEDED MEDICAL CARE

18 U.S.C. §3553(a)(2) speaks to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect of the law, to provide just punishment and adequate deterrence, and to provide the defendant with needed medical care. 18 U.S.C. §3553 (a)(2)(A)-(D).

There is no doubt this was a terrible, unprovoked crime, but Thaddeus is still in need of the same positive intervention and counseling he has needed all along. Putting him back into the system that abused, tortured and terrorized him will do little to promote justice or teach Thaddeus respect for the law.

His problem remains that he never received adequate counseling for the mental health issues that directly resulted from the ordeals he experienced in his youth spent in the prison system.

The extensive psychological evaluation that is cited throughout this Position Paper as Exhibit A was done after Thaddeus' release on the murder, for the purposes of his lawsuit. Yet even with the unequivocal diagnosis of PSTD, and confirmation of the crippling depression and anxiety he was experiencing, there was no follow up, Thaddeus did not pursue it, and no-one tried to make him. As Dr. Hough told the evaluator: "I don't think he has a strong sense of

11

self."[24] Thaddeus did not have the awareness or the life experiences to help himself. His symptoms and his addictions went untreated despite a detailed diagnosis that should have made those around him spring into action.

The help, support, counseling, therapy, and intervention Thaddeus needed when he was first released, and that should have been arranged for him when his lawsuit was settled, never happened. The system and those around Thaddeus have failed him repeatedly, as often as he has failed himself.

Thaddeus knows he has substance abuse problems, [25] and there is little doubt he would benefit from meaningful therapy and counseling. He wants nothing more from his future than to be "an old man with a cane and my son doing more than me" [26] even if he has trouble believing that could ever happen. Thaddeus should have the help, support and therapy that he has been repeatedly denied: he deserves to be a calm and grounded presence for his sons and validate the faith his grandmother always had in him.

He has taken responsibility for his criminal conduct with his plea.[27] He has cooperated with all aspects of the presentence investigation. He deserves treatment.

### C. THE GUIDELINES 18 U.S.C. §3553(A)(4)

The first step in sentencing a defendant is to correctly calculate the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *United States v. Vrdolyak,* 593 F.3d 676, 678 (7th Cir. 2010). Notably, after doing so, the court is entitled to disagree with the result of the guideline calculation and even categorically reject the

---

[24] See Exhibit A, p. 24.
[25] PSI ¶95

[26] See Exhibit A, p. 20
[27] PSI ¶19

Sentencing Commissions' policy choices. *Spears v. United States*, 555 U.S. 261, 129 S.Ct. 840, 843-44, 172 L.Ed.2d 596 (2009); *United States v. Aguilar-Huerta*, 576 F.3d 365, 466-67 (7th Cir.), cert.denied, 130 S.Ct. 811, 175 L.Ed.2d 596 (2009).

Thaddeus objects to the PSI's calculation of his advisory guideline range. Pursuant to 18 U.S.C. § 922(g)(1) and USSG §2k2.1 the base offense level should be at 12. [28] There were two firearms in the vehicle, one that belonged to Thaddeus, and one belonging to his co-defendant, Roman. Thaddeus does not ever hold or give any indication the .22 caliber weapon was possessed by him. While it is true it was present within the vehicle, that alone is not enough to infer Thaddeus constructively possessed the weapon, especially where it is so obvious that the weapon was Roman's and Thaddeus had his own weapon. By way of analogy, if the mere presence in the car was enough to infer possession, Thaddeus would then also have possessed Mr. Roman's cell phone, and even the clothing on his back.

Nor can possession be inferred from "jointly undertaken criminal activity." Frankly, there is nothing to demonstrate Roman knew what Thaddeus was going to do. And even if he did, Roman never drew his weapon, meaning it was not involved.

Thaddeus also disputes any enhancement for the firearm being used in connection with another felony[29] to the extent it is predicated upon the state crime of Aggravated Unlawful Use of a Weapon. That is a possessory offense that mirrors the crime of conviction. Defendant does not dispute the enhancement may apply for the offense of Aggravated Battery with a Firearm. Nor does he dispute the enhancement for his flight.

---

[28] PSI ¶¶ 22-23
[29] PSI ¶24

13

Thaddeus has accepted responsibility, resulting in a 2 point downward departure pursuant to USSG § 3E1.1(a), and his plea spared the Government from preparing for trial and allowed them to allocate their resources more efficiently pursuant to USSG § 3E1.1(b) for an additional 1 point downward departure.

Thaddeus has eight (8) criminal history points. The offenses are primarily related to narcotics use and reflect his post-incarceration difficulties and efforts to self-medicate for PTSD.

The resulting total offense level is 15 and pursuant to the advisory guideline range calls for a sentence of 41-51 months in the Federal Bureau of Prisons.

### D. 3553(a)(6): THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Section 3553(a)(6) requires the Court to consider "*the need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct.*" 18 U.S.C. 3553(a)(6). Given Thaddeus' distinctive history, there are no similar defendants here (or anywhere).

### E. THE KINDS OF SENTENCES AVAILABLE

District courts are to fashion a sentence sufficient but not greater than necessary to achieve the sentencing goals. 18 U.S.C. §3553(a); *Spears v. United States,* 129 S.Ct. 840 (2009). Here, the purposes of sentencing can be accomplished by sentencing Thaddeus to the minimum and directing he receive treatment wherever possible.

### CONCLUSION

Thaddeus recognizes that the crime he committed was serious and he is ready to accept his punishment. He also knows it will take hard work for him to heal himself and become a

productive member of society and a stable father to his sons. After all he has been through, Thaddeus deserves a measure of understanding, consideration, and help.

                                              Respectfully submitted,

                                              By: /s/Steven A. Greenberg
                                              One of Defendant's Attorneys

Steven A. Greenberg
Steven A. Greenberg & Associates, Ltd.
53 W. Jackson, Suite 1260
Chicago, Illinois 60604
(312) 879-9500

15